IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

JUL 3 1 2009

, Clerk of Court

| | | |
|---|---|---|
| QUANTLAB FINANCIAL, LLC, QUANTLAB TECHNOLOGIES (BVI), LTD., QUANTLAB TRADING PARTNERS (CAYMAN), LP, AND Q1 TRADING PARTNERS (CAYMAN), LP., | § § § § § § | **H-09-2444** <br><br> CIVIL ACTION NO. _____ <br><br> JURY DEMANDED |
| *Plaintiffs,* | § § | |
| *vs.* | § § | |
| JINGPU SHI, | § § | |
| *Defendant.* | § § § | |

### PLAINTIFFS' ORIGINAL VERIFIED COMPLAINT
### AND APPLICATION FOR PRELIMINARY INJUNCTION

1.     Quantlab Financial, LLC, Quantlab Technologies (BVI), Ltd., Quantlab Trading Partners (Cayman), LP, and Q1 Trading Partners (Cayman), LP (collectively "Quantlab" or "Plaintiffs") file this complaint for breach of contract, breach of common law duties of loyalty and confidentiality, common law fraud, and related violations of Texas law against Jingpu Shi ("Shi" or "Defendant").

### I.      INTRODUCTION

2.     This lawsuit is to prevent further harm to Quantlab caused by the unlawful disclosure of confidential and trade secret information by Shi to one or more competitors of Quantlab, and caused by Shi's disloyal and unlawful competition with Quantlab.  Shi has engaged in these behaviors despite the clear guidance provided by Quantlab and the written agreement he signed at the beginning of his employment with Quantlab.

3.     Shi has engaged in two, apparently separate, courses of conduct that violate his contractual, statutory, and common law duties to Quantlab.

4.    First, beginning as early as July of 2008, in violation of his common law duty of loyalty and the express terms of his written agreement, Shi was engaged in developing algorithms for use in options trading "on the side"—that is, outside of his job at Quantlab. Shi's work "on the side," whether for purely private profit, or for marketing to the public, put Shi in direct competition with Quantlab and violated duties of confidentiality and loyalty imposed by contract and common law.

5.    Second, Shi engaged in a pattern of disclosing sensitive Quantlab information to competitors in an apparent effort to market himself for future employment.[1]

6.    Because of Shi's history of disregard for his legal duties of confidentiality and loyalty, Quantlab fears that Shi is currently, or soon will be, using Quantlab's confidential, trade secret, and proprietary information for purposes of competing with Quantlab, either in a position with a competitor, or privately, or both.

## II.    PARTIES

7.    Plaintiff Quantlab Financial, LLC ("Quantlab Financial") is a limited liability company, duly formed and existing under the laws of the State of Delaware, with its principal place of business in Houston, Harris County, Texas.

8.    Plaintiff Quantlab Technologies (BVI), Ltd. ("Quantlab Technologies") is limited partnership, duly formed and existing under the laws of the British Virgin Islands.

9.    Plaintiff Quantlab Trading Partners (Cayman), LP is a limited partnership duly formed and existing under the laws of the Cayman Islands.

10.    Plaintiff Q1 Partners (Cayman), LP is a limited partnership duly formed and

---

[1] This activity eventually resulted in Shi resigning from Quantlab with the intent to accept a certain type of position with a competitor—Tower Research Capital, LLC ("Tower")—that would also violate restrictions in the written agreement.

existing under the laws of the Cayman Islands.[2]

11.    Defendant Jingpu Shi is a Chinese national citizen and a temporary legal resident of Texas.  Shi may be served at his last known address, 12507 Stoney Creek Dr., Pearland, Texas 77584.

## III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant 28 U.S.C.A. § 1332(a).  The amount in controversy will easily exceed the minimum jurisdictional limits required by this Court.

13.    Venue is proper in this district pursuant to 28 U.S.C.A. § 1391(a)(2) because the breaches of contract and other legal duties giving rise to this suit occurred in the Southern District of Texas while Defendant worked at Quantlab.

14.    Furthermore, Shi and Quantlab Financial, LLC, have contractually agreed that courts in Houston, Texas will be the proper venue for any legal proceeding involving a claim arising from the Quantlab Financial, LLC Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement.  *See* redacted Quantlab Financial, LLC Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement ("Agreement"), attached to this Complaint as Exhibit 1.

---

[2] Plaintiffs Quantlab Financial, LLC, Quantlab Technologies (BVI), Ltd., Quantlab Trading Partners (Cayman), LP, and Q1 Partners (Cayman), LP are collectively referred to throughout this complaint as "Quantlab" or "Plaintiffs."

## IV.   FACTS

### A.   Quantlab's Confidential Information

15.   Quantlab Financial, LLC, Shi's former employer, is Houston-based quantitative financial research firm that was started in 1995 and employs a team of Ph.D. scientists and other professionals to develop and maintain proprietary stock and equity trading systems.   Quantlab Financial, LLC's founders have invested more nearly 15 years of effort and tens of millions of dollars in hiring the scientists and other professionals and funding the research and development of its proprietary trading systems.

16.   Quantlab's systems use internally-developed and highly confidential adaptive modeling, risk management and operational techniques to implement quantitative strategies, mark microstructure models, algorithms and predictive indicators.   Quantlab is involved in trading all manner of securities, including options.

17.   Through Quantlab's expenditure of time and substantial financial resources, it has developed a large body of confidential information relating to predictive models, mathematical approaches, trading strategies, recognition of key predictive indicators, formulas, algorithms and methods that provide Quantlab with a considerable advantage over its competitors.   Quantlab's confidential information, which was and is developed completely in-house, is simply not legally available to Quantlab's competitors.   Quantlab takes reasonable steps to protect this confidential information, such as having all employees with access to such information sign confidentiality agreements, password-protecting sensitive files and drives on Quantlab's computer systems, limiting which employees and managers may access certain of Quantlab's confidential information, and other steps as well.

18.   Any dissemination of Quantlab's confidential and proprietary information outside

the Company makes the technology less valuable.  If Quantlab's confidential trade secrets were available to its competitors, then they could develop or modify Quantlab's existing proprietary methods to identify the same valuable trading opportunities currently identified by Quantlab, resulting in a dramatic loss of revenue to Quantlab.  In the hands of unscrupulous or malevolent parties, Quantlab's confidential information could be used to sabotage its trading activity and inflict significant financial losses.

**B.    Shi's Agreement**

19.    Before beginning his employment with Quantlab Shi executed a written agreement entitled Quantlab Financial, LLC Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement.

Section 2, the duty of loyalty section, provides:

2.  DUTY OF LOYALTY.  Employee will perform the duties of his or her assigned position in accordance wit the Company policies and rules of behavior. Employee will remain loyal to the Company at all times, avoid conflicts of interest, and promptly inform the Company of related business opportunities.  A substantial portion of Employee's compensation is provided to buy this loyalty.  It shall be a conflict of interest for Employee to, among other things, compete with or prepare to compete with the Company while employed with the Company, or to thereafter compete with the Company in violation of this Agreement. Employee shall disclose to Employer the nature and scope of any other business activity in which he or she is or becomes engaged during the Period of Employment.  This paragraph shall in no way limit any common law or statutory duties Employee owes to the Company or any rights the Company has against Employee.

*Id.* at ¶ 2.

20.    Section 3, the confidentiality section, provides in part:

(a) GENERALLY.  Employee acknowledges that the business of the Company and its Affiliates is highly competitive.  The Company will provide Employee with access to Confidential Information relating to the business of the Company and/or its Affiliates.  The Company maintains all information and materials pertaining to Company and its Affiliates, their business and operations as confidential unless intentionally made public by the Company through proper

> means.    Employee acknowledges that the Confidential Information and
> Proprietary Information items are useful, valuable, and unique assets of the
> Company.    The parties agree to treat Confidential Information items as "Trade
> Secrets" within the scope of the Uniform Trade Secrets Act or any other
> applicable law affording the Company protection from unauthorized use.
> However, irrespective of whether Confidential and Proprietary Information
> constitute Trade Secrets under applicable law, Employee agrees not to engage in
> any unauthorized use or disclosure of such information.  This paragraph shall in
> no way limit any common law or statutory duties Employee owes to the Company
> or any rights the Company has against Employee.

*Id.* at ¶ 3(a). The Agreement further expressly spells out for employees many specific categories

of information that are confidential.   These categories include business and strategic plans,

portfolio optimization methodology, ideas and principles underlying algorithms, procedures,

methods, or techniques developed by Quantlab, trading strategies, information about specific

markets, and any other information that Quantlab or an Affiliate treats or designates as

confidential information that is not publicly available.  *Id.* at ¶ 3(e).

21.    Section 4, the non-competition section, provides in part:

(c)   LIMITATIONS ON WORK FOR COMPETITORS.  For a period of two
years following termination of employment with the Company, Employee shall
not without prior written permission from Employer:
　　　(i) directly or indirectly perform for, render advice to, or otherwise assist a
Competitor in any position, job, task, function, or responsibility that is
substantially similar to the position, job, task, function, or responsibility that is
substantially similar to the positions, jobs, tasks, functions, or material
responsibilities that Employee performed on behalf of the Company at any time
during the final two (2) years of employment with the company; or
　　　(ii) directly or indirectly (including as a consultant or independent
contractor) accept employment with a Competitor in a position, or render
consulting services to a Competitor relating to such subjects, that Confidential
Information to which Employee had access during the Period of Employment
would likely assist the Competitor.
(d) NOTICE TO EMPLOYER OF POTENTIAL WORK FOR COMPETITORS.
If Employee intends to commence an employment or other service relationship
during or  within two (2) years following the Period of Employment, Employee
shall give (i) any potential new employer or party notice of this Agreement; and
(ii) the Company thirty (30) days advance notice prior to accepting such new
employment or relationship.

*Id.* at ¶ 4(c), (d).

22.    Section 5, the inventions agreement, provides in part that:

(a) OWNERSHIP; ASSIGNMENT.    All ideas, Inventions, Works, and other developments or improvements conceived or reduced to practice by employee, alone or with others, during the Period of Employment, whether or not during working hours, that (a) relate to Company's current business or anticipated future businesses, (b) involve use of Company's information, equipment facilities or supplies, (c) is or was created or conceived of, in whole or in part, while working on Company's time, or (d) result from Employee's work for Company shall be the exclusive property of Employer, and Employee expressly assignees all such ideas, Inventions, Works, and other developments or improvements to Employer.

*Id.* at ¶ 5(a).

23.    In the Agreement Shi acknowledges the reasonableness of the restrictions upon certain future competitive activities.    *Id.* at ¶ 4(h).    The Agreement also provides that the laws of the State of Texas will govern the Agreement, its construction, and the interpretation of rights and duties of the parties.    *Id.* at ¶ 6(c).    It further provides that Houston, Texas shall be the exclusive place of proper venue for any legal proceeding involving a claim arising from the Agreement and that Shi consents to personal jurisdiction of the courts in Harris County, Texas, over him. *Id.*    Shi signed the Agreement and initialed each page on November 14, 2007.

**C.    Shi's Employment**

24.    Shi's employment at Quantlab ran from November 12, 2007 through June 30, 2009, during which time he was employed as a Quantitative Developer.    His work consisted of optimizing, enhancing, and maintaining Quantlab's proprietary software and trading strategies.

25.    As part of his job, he was given wide-ranging access to Quantlab's confidential, proprietary, and trade secret information.

**D.    Shi's Competition with Quantlab and Disclosure of Confidential Information**

26.    As mentioned above, part of Quantlab's business involved the trading of options.

During the summer of 2008, specifically in June, Shi worked with Quantlab's options strategy. Despite the fact that Shi worked in this specific area for Quantlab, email correspondence recovered from Shi's work computer reveal that during the summer of 2008 he was also communicating *via* his personal email account using his work computer with a group of individuals outside of Quantlab about algorithms that the group was developing. The group was preparing the algorithms in anticipation of using them to trade options. The group clearly intended their algorithms to be used to compete for profit in the marketplace, as evidenced by the fact that their emails reference a need for confidentiality as the group moves forward. Ironically, it is Shi who is credited with raising the need for confidentiality in their venture, despite his blatant disclosures of Quantlab's confidential, proprietary, and trade secret information.

27.    Recovered emails also reveal that Shi used his work computer to disclose confidential, proprietary, and trade secret information to competitors of Quantlab, perhaps as far back as 2008, but certainly in 2009, in an attempt to market himself to these companies for a job. During the course of these email exchanges, Shi disclosed specific and detailed information regarding Quantlab's models. Among the information disclosed was attributes of Quantlab's strategies in a particular market, methodologies used to evaluate trading, methods for reducing calculation times, strategies for optimizing indicators used to predict movements of markets and the fact that Quantlab was profitably operating in a given particular market, and competitive advantages that Quantlab's systems have over others engaged in a similar line of business.

28.    Finally, and perhaps most flagrantly, the resume Shi sent to Quantlab's competitors in his job search disclosed additional, and even more detailed, confidential, proprietary, and trade secret information. Specifically, he freely describes his work experience at Quantlab, and discloses confidential information of the type described in the preceding paragraph.

### E.     Shi's Deception Regarding His Search for New Employment

29.    When Shi resigned from Quantlab, Quantlab conducted an exit interview.  During this interview, She said that he had been in talks with Tower and Worldquant.  His discussion of both of those firms referred to bonuses that he might earn based upon a percentage of profits "his model" generates.  This information indicates that he intended to be performing the same type of work that he did at Quantlab.

30.    In July 2009 the CEO of Quantlab emailed Shi to inquire about Shi's job search.  Shi replied that he had chosen to work at Tower but that he would be working as an infrastructure developer and that this was not part of what he did at Quantlab.

31.    Despite these implied reassurances that Shi did not intend to violate his Agreement with Quantlab, two employees at Quantlab were subsequently contacted by Tower for references.  The person from Tower who contacted Quantlab indicated that Tower was considering Shi, not for a position in infrastructure development, as he had represented, but for a position as a quant analyst.

## V.     CAUSES OF ACTION

### A.     Breach of Contractual Duty of Confidentiality

32.    The preceding paragraphs are incorporated herein by reference.

33.    Under the Agreement, Shi agreed that he would maintain the confidentiality of confidential, proprietary, and trade secret information and that he would not engage in unauthorized use or disclosure of such information.

34.    Shi breached his duty of confidentiality to Quantlab by, among other things, disclosing confidential, proprietary, and trade secret information to potential employers in an apparent effort to market himself to those employers.

35.    This disclosure of confidential, proprietary, and trade secret information belonging to Quantlab has damaged Quantlab, and continues to cause imminent and irreparable damage Quantlab.    Accordingly, Quantlab seeks damages and injunctive relief to prevent further dissemination of its confidential information.

**B.    Breach of Common Law Duty of Confidentiality**

36.    The preceding paragraphs are incorporated herein by reference.

37.    Under the common law, Shi had a duty to maintain the confidentiality of information learned through a confidential relationship with his employer.  Shi had access to a great deal of confidential information during his employment at Quantlab.    Some of the information rose to the level of a trade secret under common law.  The confidential information is not generally known, and gives Quantlab a competitive advantage over others who do not know it.  Quantlab has taken reasonable steps to maintain the confidentiality of the information.

38.    Shi breached his duty of confidentiality to Quantlab by, among other things, disclosing confidential, proprietary, and trade secret information to potential employers in an apparent effort to market himself to those employers.

39.    This disclosure of confidential, proprietary, and trade secret information belonging to Quantlab has damaged Quantlab, and continues to cause imminent and irreparable damage Quantlab.    Accordingly, Quantlab seeks damages and injunctive relief to prevent further dissemination of its confidential information.

**C.    Breach of Contractual Duty of Loyalty**

40.    The preceding paragraphs are incorporated herein by reference.

41.    Under the Agreement, Shi agreed that he would remain loyal to Quantlab at all times, and that he would avoid conflicts of interest, promptly inform Quantlab of related business

opportunities, that he would not compete or prepare to compete with Quantlab while employed by Quantlab.

42.    Shi breached his duty of loyalty under the Agreement by disclosing confidential, proprietary, and trade secret information to competitors of Quantlab during 2009, and possibly during 2008.  The information disclosed included, but is not limited to, information concerning markets in which Quantlab trades, strategies, and ideas and principles underlying Quantlab's procedures and methods.

43.    Shi also breached his duty of loyalty under the Agreement by preparing to compete or competing with Quantlab during his employment with Quantlab.  Specifically, the activities engaged in included, but are not limited to, the preparation of algorithms for use in an option trading venture with persons outside of Quantlab.  This activity has caused damages to Quantlab and continues to cause imminent and irreparable damage to Quantlab.  Accordingly, Quantlab seeks damages and injunctive relief to prevent Shi from further disseminating Quantlab's confidential information or using such information in competition with it.

**D.    Breach of Common Law Duty of Loyalty**

44.    The preceding paragraphs are incorporated herein by reference.

45.    Under the common law, Shi had a duty of loyalty to his employer during the course of his employment.  This duty specifically includes the duty to (a) avoid knowingly engaging in activities that are harmful to Quantlab; and (b) avoid the unauthorized disclosure and unauthorized use of Quantlab's confidential information.

46.    Shi breached his duty of loyalty under the common law by disclosing confidential, proprietary, and trade secret information to competitors of Quantlab during 2009, and possibly during 2008.  The information disclosed included, but is not limited to, information concerning

11

markets in which Quantlab trades, strategies, and ideas and principles underlying Quantlab's procedures and methods.

47.    Shi also breached his duty of loyalty under the common law by actually competing with Quantlab during his employment with Quantlab. Specifically, the activities engaged in included, but are not limited to, the development of algorithms for use in an option trading venture "on the side" with persons outside of Quantlab. This activity has caused damages to Quantlab and continues to cause imminent and irreparable damage Quantlab. Accordingly, Quantlab seeks damages and injunctive relief to prevent Shi from further disseminating Quantlab's confidential information or using such information in competition with it.

**E.    Fraud by Omission**

48.    The preceding paragraphs are incorporated herein by reference.

49.    Shi held a position at Quantlab of trust and confidence, had access to and was entrusted with a great deal of Quantlab's confidential material, and acted as Quantlab's agent in the completion of his work.

50.    Shi had a business opportunity in the form of a venture among him and a small group of individuals who were not employees of Quantlab, pursuant to which they were developing algorithms to be used to trade options, much as Quantlab does. Shi had a legal duty to disclose this opportunity to Quantlab.

51.    In order to ensure that Quantlab would not usurp his business opportunity, but also to ensure that Quantlab would continue to employ him, Shi did not inform Quantlab of the business venture, and instead maintained his silence. As a result, Quantlab continued to pay Shi, in part for his continuing loyalty, and was injured by the fact that Shi was not loyal to Quantlab for at least a year prior to the termination of his employment, despite Quantlab's continuing

payments. This has caused Quantlab damage.

**F.    Breach of Contract by Failure to Disclose Business Opportunities**

52.    The preceding paragraphs are incorporated herein by reference.

53.    Shi's Agreement with Quantlab contained a clause that required a duty of loyalty. Specifically, it required that Shi remain loyal to Quantlab during his employment, avoid conflicts of interest, and promptly inform Quantlab of related business opportunities.

54.    Shi had a business opportunity in the form of a venture among him and a small group of individuals who were not employees of Quantlab, pursuant to which they were developing algorithms to be used to trade options, much as Quantlab does.

55.    In violation of his contractual duties, Shi did not inform Quantlab of the business venture, and instead maintained his silence. As a result, Quantlab continued to pay Shi, in part for his continuing loyalty, and was injured by the fact that Shi was not loyal to Quantlab for at least a year prior to the termination of his employment, despite Quantlab's continuing payments. This has caused Quantlab damage.

**G.    Declaratory Judgment that Any Developments or Improvements by Shi Related to Options Trading Belong to Quantlab**

56.    The preceding paragraphs are incorporated herein by reference.

57.    Shi's Agreement with Quantlab contained a provision stating that all improvements, ideas, inventions, or developments related to Quantlab's business during employment shall be the property of Quantlab. Quantlab hereby seeks a declaration that it owns any improvements or developments in algorithms or programs designed to trade options developed by Shi during his time at Quantlab, including, but not limited to, July of 2008. *See* 28 U.S.C.A. §§ 2201, 2002, *et seq.*

**H.    Damages**

58.    The preceding paragraphs are incorporated herein by reference.

59.    Shi's unlawful acts have proximately caused damages to Quantlab.  Quantlab has suffered, and will continue to suffer into the future, actual damages, direct and consequential, including without limitations lost profits in the past and in the future, loss of the benefits associated with the exclusive possession of its property, and additional costs that have been incurred as a result of Shi's unlawful conduct.  In addition, Shi has been unjustly enriched by his unlawful actions.

60.    Unless Shi is restrained, ordered to pay damages, ordered to forfeit the salaries and bonuses paid to him during his periods of contractual breach and disloyalty, ordered to forfeit profits earned by violating legal duties owed to Quantlab, and unless a constructive trust is imposed, Shi will be unjustly enriched by his unlawful acts.

61.    Quantlab is entitled to injunctive relief to prevent further dissemination of its confidential information, to prevent competition springing from Shi's efforts while an employee at Quantlab, and to prevent competition from Shi during period of his restriction.  Quantlab is also entitled to recover actual damages, exemplary damages, interest, costs of court, and attorneys' fees.

**VI.    WILLFUL AND MALICIOUS CONDUCT**

62.    The preceding paragraphs are hereby incorporated by reference.

63.    Because Shi's misconduct has been willful, malicious and/or in reckless disregard to the rights of Quantlab, it is entitled to recover exemplary damages.

**VII.    APPLICATION FOR A PRELIMINARY INJUNCTION**

64.    The preceding paragraphs are incorporated herein by reference.

14

65. Quantlab seeks all appropriate temporary and permanent injunctive relief, including a preliminary injunction, and ultimately a permanent injunction. Unless Shi is enjoined from competing with Quantlab and from disseminating Quantlab's confidential information, the harm shall be continuing.

## A.   Legal Standard for the Granting of a Preliminary Injunction

66. The elements for obtaining a preliminary injunction in the Fifth Circuit are well settled. The moving party must establish the following: (1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) the threatened injury outweighs any damage that the injunction may cause the opposing party, and (4) the injunction will not disserve the public interest. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989); *H&W Indus., Inc. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572-73 (5th Cir. 1974). The decision to grant or deny an application for injunction is within the discretion of the district court and reviewed under an abuse of discretion standard. *Lakedreams*, 932 F.2d at 1107; *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

## B.   Substantial Likelihood of Success on the Merits

67. Shi has communicated to Quantlab that he plans to begin working for Tower in the near future, in violation of his two year non-compete covenant. Emails obtained from Shi's computer at Quantlab show that he emailed confidential information to prospective employers, in violation of both the common law and his contract, and that he engaged in the development of algorithms and/or software to ultimately be used in a venture that would necessarily compete

with Quantlab.

### C.    Irreparable Injury to Quantlab Will Result Without Injunction

68.    Injury to Quantlab is both actual and imminent in that Shi has disclosed and appears to be continuing to disclose confidential information of Quantlab.  Revealing any confidential, proprietary or trade secret information to competitors or potential competitors will result in irreparable harm because it will take away the competitive advantage that Quantlab has in the marketplace.

69.    The injury would not be remediable at law because the damage cannot be undone and the substitute measure of damages would be too difficult to calculate, in that it would involve calculating the amount of money lost due to lost competitive advantage over the duration of Quantlab's existence, whatever that might be.  Furthermore, once the information at issue has spread beyond Quantlab's control, it will be impossible to determine who has access to it.  In other words, a single lawsuit, or even multiple lawsuits against the known user of the information, such as Tower, would not necessarily remedy all harms to Quantlab.  But even if monetary damages could be calculated, the losses (and threatened losses) to Quantlab are likely to exceed Shi's financial net worth and, therefore, would prevent Quantlab from obtaining complete relief

### D.    Injury to Quantlab Outweighs Personal Harm to Shi

70.    The potential injury to Quantlab far outweighs any potential harm to Shi, as Shi is only limited from working for companies where his knowledge of Quantlab's workings would be beneficial to the new employer, or at jobs where his functions and duties are similar to those at Quantlab.  Therefore, he can still work in the financial industry, he just cannot use or disclose confidential information or compete with Quantlab in a manner that would violate his non-

competition agreement.

### E.    Enforcement Does Not Disserve the Public Interest

71.    The injunction in this case would serve the public interest by protecting Quantlab and other companies' abilities to entrust employees with confidential information knowing that such information is legally protectable, even where the employee at issue turns out to be less trustworthy than was otherwise imagined.

### F.    Shi Contractually Agreed to Grant Quantlab Injunctive Relief in This Situation

72.    The Agreement contains a provision that states that Shi agrees that in the event of a breach or threatened breach of the Agreement. *See* Exhibit 1 at 6(g). Shi agreed that Quantlab would be entitled to injunctive relief and that one thousand dollars ($1,000) would be the amount of bond required to be posted. *Id.*

### G.    Quantlab Needs Injunctive Relief

73.    Based on the foregoing, Quantlab asks this Court to enter a preliminary injunction, and following a trial on the merits a permanent injunction awarding the following relief:

- that defendant refrain from using or disclosing any of Quantlab's confidential, proprietary, or trade secret information in any respect, including without limitation, in his resumes, interviews, employment, or solicitations for future employment.

- that defendant refrain from engaging in any unauthorized use or disclosure of Quantlab's confidential information, which includes trade secrets and other information that has been developed or used and/or will be developed or used by or for the benefit, or at the expense, of Quantlab or its affiliates that cannot be obtained readily by third parties from outside sources, in whatever form, tangible or intangible, pertaining to the business of Quantlab or any affiliate, or their employees, investors, clients consultants, or business associates

- that defendant refrain from engaging in any unauthorized use or disclosure of Quantlab's proprietary information, which includes all information and any idea in whatever form, tangible or intangible, pertaining to the business of Quantlab or any affiliate, or their employees, investors, clients,

consultants, or business associates, which was produced by any employee of Quantlab or any affiliate in the course of his or her employment, or otherwise produced by, for or on behalf of Quantlab or any affiliate.

- that defendant refrain from directly or indirectly performing for, rendering advice to, or otherwise assisting a competitor of Quantlab's in any position, job, task, function, or responsibility that is substantially similar to the positions, jobs, tasks, functions, or material responsibilities that Employee performed on behalf of Quantlab at any time during the final two years of Shi's employment with Quantlab.

- that defendant refrain from directly or indirectly (including as a consultant or independent contractor) accepting employment with a competitor of Quantlab's in a position, or rendering consulting services to a competitor of Quantlab's relating to such subjects, that confidential information to which Shi had access during his period of employment with Quantlab would likely assist the competitor.

- that the non-competition restrictions be extended for every day that defendant is found in breach pursuant to the tolling provisions of the Agreement or the equitable extension doctrine.

- that defendant honor the Agreement, including Sections 3, 4 and 5.

74. Quantlab is willing to post a bond in connection with the issuance of the preliminary injunction.

## VIII.  ATTORNEYS' FEES

75. Quantlab has been forced to retain the undersigned attorneys in connection with this matter. Quantlab has agreed to pay the undersigned attorneys for their services. Quantlab asks that this Court award it attorneys' fees and other costs pursuant to sections 38.001 of the Texas Civil Practices and Remedies Code.

## IX.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Quantlab prays that Shi be commanded to appear and answer, and that Quantlab have and recover the following orders and judgments from Shi:

1.  A preliminary injunction be ordered as requested in Section VII above;

2.      A permanent injunction be ordered on final trial of this cause, among other things restraining Defendant as requested in Section VII above;

3.      All actual damages suffered by Plaintiffs, an amount which is in excess of the minimum jurisdictional limit of the Court;

4.      A constructive trust in favor of Plaintiffs be imposed upon all proceeds of Defendant's wrongful acts;

5.      Forfeiture of any compensation paid during periods of disloyalty.

6.      Attorneys' fees;

7.      Costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed by law;

8.      Exemplary damages in a sum to be determined by the Court and finders of fact in an amount reasonable and necessary to punish the Defendant for its willful, malicious and wrongful conduct and to deter future misconduct; and

9.      Any and all other relief Quantlab may show itself entitled to in law or equity.

Plaintiffs request a jury trial.

Respectfully submitted,

Tim McInturf (Attorney-in-Charge)
State Bar No. TX 00788020
S.D. Tex. I.D. No. 18058

*OF COUNSEL:*

LITTLER MENDELSON, P.C.

Micah Heilbrun
State Bar No. TX 24041080
S.D. Tex. I.D. No. 58226
Tim Rybacki
State Bar No. 24056248
S. D. Tex. I.D. No. 718501
1301 McKinney Street, Suite 1900
Houston, Texas 77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)

ATTORNEYS FOR PLAINTIFFS QUANTLAB
FINANCIAL, LLC, QUANTLAB
TECHNOLOGIES (BVI), LTD., QUANTLAB
TRADING PARTNERS (CAYMAN), LP, AND Q1
TRADING PARTNERS (CAYMAN), LP.,

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, on this day personally appeared Bruce P. Eames, who is known to me, and who under oath stated the following:

My name is Bruce P. Eames. I am the Chief Executive Officer of Quantlab Financial, LLC. I am authorized to verify the foregoing Plaintiff's Original Verified Complaint and Application for Preliminary Injunction. I have read the foregoing Plaintiff's Original Verified Complaint and Application for Preliminary Injunction. Based upon information within my personal knowledge, reported to me in the ordinary course of business by company personnel with personal knowledge of the information reported, my review of Company business records, and my review of forensic electronic data recovered by a third-party computer forensics company and by our own Chief Technology Officer, I affirm that the statements of fact contained in Section I ("Introduction") and Section IV ("Facts") are true and correct, except as stated upon information and belief.

BRUCE P. EAMES
CHIEF EXECUTIVE OFFICER
QUANTLAB FINANCIAL, LLC

SUBSCRIBED AND SWORN TO BEFORE ME on this __30th__ day of July 2009, to certify which witness my hand and official seal of office.

RHONDA KAY COLEMAN
MY COMMISSION EXPIRES
June 22, 2013

Notary Public in and for
The State of Texas